```
1
2    UNITED STATES DISTRICT COURT
3    SOUTHERN DISTRICT OF NEW YORK
4    ----------------------------------x
5                                      :
6    BARBARA NITKE and                 :
7    THE NATIONAL COALITION FOR SEXUAL :
8    FREEDOM,                          :        01 Civ. 11476 (RMB)
9                                      :
10                     Plaintiffs,     :        FINDINGS OF FACT
11                                     :             AND
12           -v-                       :        CONCLUSIONS OF LAW
13                                     :
14                                     :
15   ALBERTO R. GONZALES, ATTORNEY     :
16   GENERAL OF THE UNITED STATES OF   :
17   AMERICA and THE UNITED STATES OF  :
18   AMERICA,                          :
19                                     :
20                     Defendants.     :
21                                     :
22   ----------------------------------x
```

```
23   JOHN WIRENIUS, Leeds Morelli & Brown, P.C.,
24   Carle Place, NY, for plaintiffs.
```

```
25   BENJAMIN H. TORRANCE, Assistant United
26   States Attorney (David N. Kelley, United
27   States Attorney for the Southern District
28   of New York, Andrew W. Schilling, and Beth
29   Goldman, Assistant United States Attorneys,
30   of counsel), New York, NY, for defendants.
```

31   BEFORE:  ROBERT D. SACK, Circuit Judge,* RICHARD M. BERMAN and
32   GERARD E. LYNCH, District Judges.

33   PER CURIAM:

34          Plaintiffs Barbara Nitke and the National Coalition for

35   Sexual Freedom[1] challenge the constitutionality of the

---

        *  Of the United States Court of Appeals for the Second
Circuit.

        [1]  In our previous opinion and order, we dismissed the
complaints of plaintiffs Nitke and the National Coalition for
Sexual Freedom Foundation (an entity different from plaintiff the

1    Communications Decency Act of 1996 (CDA), enacted as title V of

2    the Telecommunications Act of 1996, Pub. L. No. 104-104, 110

3    Stat. 133 (amending and codified at scattered sections of 47

4    U.S.C.).  The CDA's obscenity provisions make it a crime, <u>inter</u>

5    <u>alia</u>, knowingly to transmit obscenity by means of the Internet to

6    a minor.  47 U.S.C. § 223(a)(1)(B).  The plaintiffs seek a) a

7    declaratory judgment that the CDA is unconstitutional because it

8    is substantially overbroad, and b) a permanent injunction against

9    its enforcement.  <u>See</u> Am. Compl. at 15.

10           The plaintiffs instituted this action in December 2001.

11   It was referred to us as a three-judge panel pursuant to section

12   561 of the CDA, 110 Stat. at 142 (codified at 47 U.S.C. § 223

13   note).  On October 27-28, 2004, after our decision on the

14   defendants' motion to dismiss and the plaintiffs' motion for a

15   preliminary injunction, <u>Nitke v. Ashcroft</u>, 253 F. Supp. 2d 587

16   (S.D.N.Y. 2003) (<u>Nitke I</u>), and subsequent repleading and

17   discovery, we held a bench trial on the plaintiffs' remaining

18   claim challenging the CDA's alleged overbreadth.  Pursuant to

19   Federal Rule of Civil Procedure 52(a), we set forth our findings

20   of fact and conclusions of law below.

21                              **BACKGROUND**

22   I.  The Parties

---

National Coalition for Sexual Freedom) for lack of standing, with
leave to replead.  <u>Nitke v. Ashcroft</u>, 253 F. Supp. 2d 587,
596-99, 611 (S.D.N.Y. 2003).  Nitke has repleaded; the Foundation
did not and is therefore no longer a plaintiff.

1          Plaintiff Barbara Nitke is an art photographer whose
2    work focuses on sexually explicit subject matter.  Nitke Decl.
3    ¶¶ 1, 3.  Much of her work features couples engaging in
4    sadomasochistic sexual behavior.  Id. ¶ 3.  Many of her
5    photographs include explicit images of male and female genitalia,
6    oral, anal, and vaginal intercourse, and other sexual acts.
7    Pls.' Ex. 4.  Nitke is on the faculty of the School of Visual
8    Arts and is President of the Camera Club of New York.  Nitke
9    Decl. ¶ 1.  Her work has been displayed in several galleries and
10   is in the permanent collection of at least one museum.  Id. ¶ 2.
11   Nitke has created and maintains a Website that displays her
12   photographs, which, she asserts, are in furtherance of her
13   artistic goals.  Id. ¶ 9.

14         Plaintiff the National Coalition for Sexual Freedom
15   (NCSF) is a not-for-profit organization formed for the purpose of
16   addressing perceived discrimination against individuals and
17   groups who engage in non-mainstream sexual practices, including
18   sadomasochism and polyamory.  Wright Rev. Decl. ¶ 2.  NCSF
19   members include both organizations and individuals.  Id.  Some of
20   these members maintain Websites that contain sexually explicit
21   content.  Id. ¶ 3.  NCSF provides a forum for members to share
22   concerns about the consequences of putting certain content on
23   their Websites.  Id.  NCSF also gathers and disseminates
24   information about conferences and meetings relating to the issue
25   of sadomasochism, receives requests for assistance regarding

media incidents, and has published organization guidelines for members entitled "How to Protect Your Event."  Id. ¶¶ 8-9.

Defendant Alberto Gonzales is the Attorney General of the United States.[2]  In that capacity, he is "head of the Department of Justice and chief law enforcement officer of the Federal Government."  U.S. Dep't of Justice, "Office of the Attorney General," at http://www.usdoj.gov/ag/ (last visited June 9, 2005).

II.  The Internet

The Internet is a network of interconnected private and public computers that are linked for communications and data-sharing purposes.  See 47 U.S.C. § 230(f)(1); see also Nitke I, 253 F. Supp. 2d at 593-94.  Individuals may obtain access to the Internet through computers that are connected to it directly or through an Internet service provider.  The World Wide Web is one component of the Internet.  The Web is formed from a network of computers called "Web servers" that host pages of content accessible via the Hypertext Transfer Protocol (HTTP).  Nitke v. Ashcroft, No. 01 Civ. 11476, slip. op. at 23 (S.D.N.Y. Sept. 16, 2004) (joint pre-trial order in the instant litigation).  Individuals may view information on the Web using "browser" software, and may publish information to the Web by placing

---

[2]  At the time the plaintiffs commenced this action, John Ashcroft was Attorney General of the United States and was named as a defendant.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Attorney General Gonzales was substituted for former Attorney General Ashcroft as a defendant.

1    information on a Web server, directly or through a Website host.

2    Id.  Websites often provide links to other Websites.  Id.

3    Individuals and other content providers may acquire with relative

4    ease the necessary server space to put up Websites or transmit

5    information in other ways.   Many sites allow users to access all

6    Webpages that the site contains; other sites require that the

7    user enter specified information before he or she can gain access

8    to their contents.  McCulloch Decl. ¶ 2; see also Reno v. ACLU,

9    521 U.S. 844, 849-53 (1997) (describing the Internet in the

10   course of addressing constitutionality of portion of the CDA);

11   ACLU v. Reno, 929 F. Supp. 824, 830-38 (E.D. Pa. 1996) (same),

12   aff'd, 521 U.S. 844, 849-53 (1997).

13   III.  The CDA

14        The CDA prohibits "by means of a telecommunications

15   device knowingly . . . initiat[ing] the transmission of[] any

16   comment, request, suggestion, proposal, image, or other

17   communication which is obscene or child pornography, knowing that

18   the recipient of the communication is under 18 years of age,

19   regardless of whether the maker of such communication placed the

20   call or initiated the communication."  47 U.S.C. § 223(a)(1)(B).

21   "Given the size of the potential audience for most messages, in

22   the absence of a viable age verification process, the sender [of

23   any given communication] must be charged with knowing that one or

24   more minors will likely view it."  Reno v. ACLU, 521 U.S. at 876.

25   Thus, the CDA prohibits (subject to affirmative defenses

discussed below) any transmission of obscenity (or child
pornography which is not at issue here) by means of the Internet.

As the parties do not dispute, the CDA incorporates the
definition of obscenity set forth in Miller v. California, 413
U.S. 15 (1973).  See Nitke I, 253 F. Supp. 2d at 594.  Under the
Miller test, a communication is obscene if, first, "the average
person, applying contemporary community standards would find that
the work, taken as a whole, appeals to the prurient interest;"
second, "the work depicts or describes, in a patently offensive
way, sexual conduct," when judged by contemporary community
standards; and third, "the work, taken as a whole, lacks serious
literary, artistic, political, or scientific value."  Miller, 413
U.S. at 24 (citations and internal quotation marks omitted).

The first and second prongs of the Miller test are, by
their terms, determined in accordance with contemporary community
standards in the relevant locality.  See id.; see also Nitke I,
253 F. Supp. 2d at 600-01.  Thus, whether material appeals to the
prurient interest and is patently offensive are questions of fact
that depend on a particular community's standards.  See Miller,
413 U.S. at 30; see also Nitke I, 253 F. Supp. 2d at 601.  As a
result, material that is not legally obscene in one locality may
be legally obscene in another.  See Miller, 413 U.S. at 32-33;
see also Nitke I, 253 F. Supp. 2d at 602.  By contrast, the third
prong of the Miller test -- that the work not have serious
literary, artistic, political, or scientific value -- is based on

1    a national standard for such value that is established as a

2    matter of law.  Reno v. ACLU, 521 U.S. at 873; see also Nitke I,

3    253 F. Supp. 2d at 600-01.

4         The CDA provides two affirmative defenses: that the

5    defendant "has taken, in good faith, reasonable, effective, and

6    appropriate actions under the circumstances to restrict or

7    prevent access by minors to a[n obscene] communication" or "has

8    restricted access to such communication by requiring use of a

9    verified credit card, debit account, adult access code, or adult

10   personal identification number."  47 U.S.C. § 223(e)(5).

11                              **DISCUSSION**

12        As a foundation for our findings of fact and

13   conclusions of law, we rehearse here the basic legal principles

14   applicable to resolving this pre-enforcement challenge to the

15   CDA.

16   I.  Standing to Challenge the CDA

17        The Government argues that the plaintiffs do not have

18   standing to challenge the CDA.  Defs.' Post-Trial Proposed

19   Findings Fact & Conclusions Law (Defs.' PTPF) ¶ 50.  Under

20   Article III of the United States Constitution, the jurisdiction

21   of the federal courts is limited to "adjudicating actual 'cases'

22   and 'controversies.'"  Allen v. Wright, 468 U.S. 737, 750 (1984).

23   The doctrine of standing grew out of this fundamental rule.  "In

24   essence the question of standing is whether the litigant is

25   entitled to have the court decide the merits of the dispute or of

1   particular issues." Id. at 750-51 (quoting Warth v. Seldin, 422

2   U.S. 490, 498 (1975)).  To meet the constitutional requirements

3   for standing, "[a] plaintiff must allege personal injury fairly

4   traceable to the defendant's allegedly unlawful conduct and

5   likely to be redressed by the requested relief." Id. at 751.

6        "The party invoking federal jurisdiction bears the

7   burden of establishing these elements." Lujan v. Defenders of

8   Wildlife, 504 U.S. 555, 561 (1992).  "Since they are not mere

9   pleading requirements but rather an indispensable part of the

10  plaintiff's case, each element must be supported in the same way

11  as any other matter on which the plaintiff bears the burden of

12  proof, i.e., with the manner and degree of evidence required at

13  the successive stages of the litigation." Id.

14       The injury required for standing to pursue a First

15  Amendment challenge may take the form of "constitutional

16  violations . . . aris[ing] from the deterrent, or 'chilling,'

17  effect of government regulations that fall short of a direct

18  prohibition against the exercise of First Amendment rights."

19  Laird v. Tatum, 408 U.S. 1, 11 (1972); accord Meese v. Keene, 481

20  U.S. 465, 472 (1987).  For such injury to meet the requirement

21  that it be "distinct and palpable," Allen, 468 U.S. at 751, the

22  plaintiff must have suffered more than a "subjective 'chill,'"

23  Laird, 408 U.S. at 13-14; see also Nitke I, 253 F. Supp. 2d at

24  596.  The plaintiff must show that she is subject to a "specific

25  present objective harm or a threat of specific future harm."

1   Laird, 408 U.S. at 13-14; see also Nitke I, 253 F. Supp. 2d at

2   596.  In a pre-enforcement challenge such as the one before us,

3   the plaintiff may do so by establishing that she has "an actual

4   and well-founded fear that the law will be enforced against" her.

5   Vt. Right to Life Comm. v. Sorrell, 221 F.3d 376, 382 (2d Cir.

6   2000) (quoting Virginia v. Am. Booksellers Ass'n, 484 U.S. 383,

7   393 (1988)).

8        To show that a fear is "actual," "a plaintiff must

9   proffer some objective evidence to substantiate his claim that

10  the challenged conduct has deterred him from engaging in

11  protected activity."  Bordell v. Gen. Elec. Co., 922 F.2d 1057,

12  1061 (2d Cir. 1991); see also Nitke I, 253 F. Supp. 2d at 596.

13  And to show that a fear is "well-founded," the plaintiff must

14  show that it is reasonable.  Vt. Right to Life, 221 F.3d at 383.

15  A fear that a statute will be enforced against a plaintiff is

16  reasonable if the plaintiff's interpretation of the statute to

17  reach his or her conduct is itself reasonable.  See Am.

18  Booksellers Ass'n, 484 U.S. at 392 (concluding that plaintiffs

19  had standing to bring pre-enforcement First Amendment challenge

20  where they would suffer injury "if their interpretation of the

21  statute is correct").  Mere assurances by the government that it

22  does not seek to enforce the statute do not ipso facto make such

23  a fear unreasonable, because "there is nothing that prevents the

24  [government] from changing its mind" and the resulting

1  uncertainty is sufficient to establish the reasonableness of a

2  fear.  <u>Vt. Right to Life</u>, 221 F.3d at 383.

3          In addition to showing that they have suffered injury

4  in fact, plaintiffs must also show that the injury is "fairly

5  traceable" to the conduct complained of, and "likely to be

6  redressed" by the relief sought.  <u>Allen</u>, 468 U.S. at 750; <u>see</u>

7  <u>also</u> <u>Nitke I</u>, 253 F. Supp. 2d at 596.  The "fairly traceable"

8  requirement is satisfied if there is a "causal connection between

9  the assertedly unlawful conduct and the alleged injury." <u>Allen</u>,

10 468 U.S. at 753 n.19.  And the "redressability" requirement is

11 satisfied if there is a "causal connection between the alleged

12 injury and the judicial relief requested."  <u>Id.</u>

13         The doctrine of associational standing provides a

14 limited exception to the requirement that a plaintiff "must

15 assert his own legal rights and interests." <u>Bano v. Union</u>

16 <u>Carbide Corp.</u>, 361 F.3d 696, 715 (2d Cir. 2004).  Under this

17 doctrine, "an association [may have] standing to maintain a suit

18 to redress its members' injuries, rather than an injury to

19 itself" if it can meet a three-prong test.  <u>Id.</u> at 713.  "Under

20 this test, the association has standing if '(a) its members would

21 otherwise have standing to sue in their own right; (b) the

22 interests it seeks to protect are germane to the organization's

23 purpose; and (c) neither the claim asserted nor the relief

24 requested requires the participation of individual members in the

25 lawsuit.'" <u>Id.</u> (quoting <u>Hunt v. Wash. State Apple Adver. Comm'n</u>,

1    432 U.S. 333, 343 (1977)); see also Nitke I, 253 F. Supp. 2d at

2    597.

3    II.  Overbreadth

4           The plaintiffs assert that the CDA is substantially

5    overbroad in violation of the First Amendment because it reaches

6    both obscene and non-obscene speech.  Am. Compl. ¶¶ 43-46.

7    Obscene speech is not protected under the First Amendment.  Sable

8    Communications of Cal., Inc. v. FCC, 492 U.S. 115, 124 (1999).

9    In Miller, 413 U.S. at 24, the Supreme Court established the

10   three-part test for obscenity set forth above.  Speech that is

11   not obscene under the Miller test is entitled to First Amendment

12   protection even if it is sexually explicit or "indecent."[3]  Id.

13   at 26-28; see also Reno v. ACLU, 521 U.S. at 874-75.  Congress

14   may regulate obscene speech so long as such regulation is

15   rational.  See Miller, 413 U.S. at 19-20.

16          A statute is overbroad if it prohibits speech that is

17   protected by the First Amendment.  Broadrick v. Oklahoma, 413

18   U.S. 601, 612 (1973).  Although minor overinclusiveness is not

19   enough to render a statute unconstitutional, Fort Wayne Books,

20   Inc. v. Indiana, 489 U.S. 46, 60 (1989), if the statute prohibits

---

[3]  This assumes, of course, that the speech does not fall
outside the First Amendment for unrelated reasons.  See, e.g.,
Virginia v. Black, 538 U.S. 343, 358-59 (2003) (discussing the
"few limited areas, [such as fighting words, that] are of such
slight social value as a step to truth that any benefit that may
be derived from them is clearly outweighed by the social interest
in order and morality," and where the speech is therefore not
constitutionally protected (internal quotation marks omitted)).

1   a substantial amount of speech relative to its legal breadth,

2   then it is facially invalid, <u>Virginia v. Hicks</u>, 539 U.S. 113,

3   123-24 (2003); <u>accord</u> <u>McConnell v. Fed. Election Comm'n</u>, 540 U.S.

4   93, 207 (2003).  "In such cases, it has been the judgment of [the

5   Supreme Court] that the possible harm to society in permitting

6   some unprotected speech to go unpunished is outweighed by the

7   possibility that protected speech of others may be muted and

8   perceived grievances left to fester because of the possible

9   inhibitory effects of overly broad statutes." <u>Broadrick</u>, 413

10   U.S. at 612.  The substantiality of such overbreadth is

11   determined by comparing the amount of protected speech that is

12   prohibited by the statute to its "plainly legitimate sweep." <u>Id.</u>

13   at 615; <u>accord</u> <u>Fort Wayne Books</u>, 489 U.S. at 60; <u>see also</u> <u>Nitke</u>

14   <u>I</u>, 253 F. Supp. 2d at 605.

15        The plaintiffs assert that by applying the local

16   standards of the <u>Miller</u> test to the Internet, the CDA sweeps

17   within its prohibitions a substantial amount of protected speech.

18   Under the <u>Miller</u> test, speech that is legally obscene and

19   therefore without constitutional protection in one community may

20   enjoy full protection in another. <u>Miller</u>, 413 U.S. at 32-33; <u>see</u>

21   <u>also</u> <u>Nitke I</u>, 253 F. Supp. 2d at 603.  The plaintiffs assert that

22   they cannot control the locations to which their Internet

23   publications are transmitted, and therefore any material that

24   they publish to the Internet may be prohibited under the CDA

25   because it may be legally obscene in one or more communities even

1    if not legally obscene in others.  Thus, they argue that the CDA

2    is overbroad inasmuch as it prohibits, based on the standards

3    prevailing in one or more communities, a substantial amount of

4    speech that is protected, based on standards prevailing in at one

5    or more other communities.

6            In our earlier Opinion and Order, we denied the

7    government's motion to dismiss the complaint with respect to the

8    plaintiffs' overbreadth challenge.  Nitke I, 253 F. Supp. 2d at

9    606.[4]  In so doing, we concluded that the Supreme Court's opinion

10   in Ashcroft v. ACLU, 535 U.S. 564 (2002), did not preclude the

11   plaintiffs' challenge to the CDA's obscenity provisions on

12   overbreadth grounds.  Nitke I, 253 F. Supp. 2d at 605-06.  We

13   explained that while "three Justices [in Ashcroft v. ACLU] formed

14   a plurality that would have held that the community standards

15   test could never render an Internet statute overbroad," "no one

16   opinion carried a majority of the Justices" and we would

17   therefore hew to the "'position taken by those Members who

18   concurred in the judgments on the narrowest grounds.'"  Id. at

19   605 (quoting Marks v. United States, 430 U.S. 188, 193 (1977)).

20   We concluded that Ashcroft v. ACLU "does not preclude overbreadth

---

   [4] In Nitke I, we also granted the government's motion to
dismiss the complaint with respect to the plaintiffs' claim that
the CDA was unconstitutionally vague as a result of its
incorporation of the Miller standard, concluding that that claim
was foreclosed by the Supreme Court's decision that the Miller
standard was not unconstitutionally vague.  Nitke I, 253 F. Supp.
2d at 608 (citing Miller, 413 U.S. at 27-28).

1    challenges to other federal Internet obscenity statutes based on

2    their use of the community standards test."   Id.

3            As we explained in Nitke I, whether the CDA is

4    overbroad is an empirical question.   Nitke I, 253 F. Supp. 2d at

5    607.   In this declaratory and injunctive action, the plaintiffs

6    bear the burden of establishing that the CDA is overbroad and the

7    substantiality of such overbreadth.   In Nitke I, we detailed what

8    the plaintiffs would be required to establish to prevail on this

9    claim.   Id. at 606-08.   First, we said that the plaintiffs would

10    "need to present evidence as to the total amount of speech that

11    is implicated by the CDA."   Id. at 606.   Second, we said that the

12    plaintiffs must "present evidence as to the amount of protected

13    speech -- lacking in serious value [and therefore not

14    categorically protected], but potentially not patently offensive

15    or appealing to the prurient interest in all communities [and

16    therefore possibly lawful in some communities while unlawful in

17    others]."   Id.   In presenting evidence on this second point, we

18    stated that the plaintiffs were required to 1) "demonstrate how

19    much material is potentially not protected by the serious

20    societal value prong," id.; 2) "examine community standards in

21    various localities and the extent to which they differ with

22    respect to the material at issue," id. at 607, in order to

23    "establish that the variation in community standards is

24    substantial enough that the potential for inconsistent

25    determinations of obscenity is greater than that faced by

26    purveyors of traditional pornography, who can control the

1    dissemination of their materials," id.; 3) "present evidence that

2    this variation in community standards will actually cause

3    speakers to suppress their speech, because of the technological

4    impossibility of reliably limiting the geographic distribution of

5    their materials," id.; and 4) "present evidence tending to show

6    that the CDA's two affirmative defenses do not sufficiently limit

7    the amount of protected speech covered by the statute, or

8    plaintiffs' exposure to multiple prosecutions under different

9    standards," id.  As to the latter, the plaintiffs assert that it

10   is technologically impossible for publishers to take

11   "effective . . . actions . . . to restrict or prevent access," 47

12   U.S.C. § 223(e)(5)(A), to their Webpages and that the cost and

13   privacy concerns associated with credit card verification may be

14   prohibitive.  Am. Compl. ¶¶ 37-38; Nitke Decl. ¶¶ 20-21.

15                **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

16          During the two-day bench trial of this case, pursuant

17   to the Joint Pre-Trial Order, the witnesses called by the parties

18   gave their direct testimony by declaration.  These declarations

19   were marked as exhibits at trial and the court heard cross-

20   examination of the witnesses.  Our findings of fact and

21   conclusions of law based on that trial are as follows.

22   I.  Findings of Fact

23          1.  Images posted on the Internet may generally be

24   viewed by Internet users in any community in the United States,

25   although owners of Websites may employ software in an attempt to

26   restrict access to their sites.  Compare Laurie Decl. passim

1   (stating that such technology is ineffective), Finkelstein Decl.

2   ¶¶ 8, 13-18 (same), Tr. at 60, 63 (Hechtman testimony)

3   (discussing use of credit cards to verify age and stating that it

4   is ineffective), <u>with</u> Miltonberger Decl. ¶ 2 (stating that

5   current technology is effective), McCulloch Decl. ¶ 2 (same).

6        2.  Works that are considered offensive in a community

7   may engender an obscenity prosecution in that community,

8   irrespective of whether it will ultimately be judicially

9   determined that those works have serious artistic or social

10  value.  Danto Decl. ¶¶ 10-12; Nitke Decl. ¶ 12; Tr. at 73-74

11  (Steinberg testimony).

12       3.  The determination of whether certain works have

13  serious artistic or social value turns on the subjective judgment

14  of the trier of fact, and the difficulty of assessing whether a

15  work will be deemed to have serious artistic or social value

16  increases when the work deals with sexually explicit subject

17  matter.  Danto Decl. ¶¶ 10-11, 15; Tr. at 93-94 (Danto

18  testimony).

19       4.  Nitke refrained from publishing on her Website

20  certain sexually explicit images, including depictions of sexual

21  practices that were not "mainstream" or which Nitke thought would

22  be otherwise controversial because of their sexual content, Nitke

23  Decl. ¶ 16; Pls.' Ex. 4, because she was afraid that she might be

24  prosecuted in one or more communities for doing so, Nitke Decl.

25  ¶ 16.

1       5.  Because of the sexual content of Nitke's images,

2 she faces a material risk that her works will be considered

3 "patently offensive" and "appeal[ing] to the prurient interest"

4 in one or more communities and that she will be prosecuted for

5 obscenity.  Tr. at 288-90 (Douglas testimony) (stating that

6 images depicting non-mainstream sexual acts are more likely to be

7 prosecuted); Douglas Decl. ¶ 5(b).

8       6.  Although Nitke's work is regarded by many as having

9 serious artistic value, Nitke Decl. ¶¶ 17-18 (stating that works

10 were created in line with artistic aims); Danto Decl. ¶ 12, and

11 the government concedes here that Nitke's photographs have such

12 value, Defs.' PTPF ¶ 51; Tr. at 293, there is a reasonable

13 likelihood that other federal prosecutors will not agree that her

14 work has such value and will prosecute her under the CDA.

15       7.  There is also a reasonable likelihood that some

16 triers of fact, applying a national standard for artistic value,

17 would not agree that Nitke's work has serious artistic value.

18       8.  The Eulenspiegel Society (TES) is a member

19 organization of plaintiff NCSF.  Hechtman Decl. ¶ 1.

20       9.  TES chose not to post sexually explicit materials,

21 including the contents of its magazine Prometheus, on its Website

22 in order to avoid a possible prosecution for obscenity in one or

23 more communities.  Hechtman Decl. ¶¶ 5-6; Pls.' Ex. 12.

24       10.  Because of the sexual content of these materials,

25 TES faces a substantial likelihood that the materials would be

26 considered "patently offensive" and "appeal[ing] to the prurient

1   interest" in some communities.  See Tr. at 288-90 (Douglas

2   testimony); Douglas Decl. ¶ 5(b).

3          11.  Although the materials that TES refrained from

4   posting on its Website are regarded as having serious artistic

5   and social value by some, see Hechtman Decl. ¶ 8, there is a

6   reasonable likelihood that some triers of fact would find that

7   these materials lacked serious artistic or social value.

8          12.  NCSF provides a forum for members of the

9   organization to share concerns about the consequences of placing

10  certain content on their Websites and aims to fight what it

11  considers to be discrimination against and provide support for

12  individuals and groups who engage in non-mainstream sexual

13  practices.

14         13.  The plaintiffs have offered insufficient evidence

15  to enable us to make a finding as to "the total amount of speech

16  that is implicated by the CDA," Nitke I, 253 F. Supp. 2d at 606.

17  Indeed, the plaintiffs concede that they cannot "compute the

18  number of potentially affected Websites and other speakers with

19  anything like accuracy."  Pls.' Post-Trial Proposed Findings Fact

20  & Conclusions Law (Pls.' PTPF) ¶ 48.

21         14.  The plaintiffs have offered evidence that there

22  are at least 1.4 million Websites that mention "BDSM" (bondage,

23  discipline, and sadomasochism).  Moser Decl. ¶ 12.  The

24  plaintiffs have offered insufficient evidence to enable us to

25  make a finding, however, as to how many of those sites might be

26  considered obscene, let alone how many would be considered

1   obscene in at least one community while considered not obscene in

2   others.

3        15.   The plaintiffs have submitted images and written

4   works that represent material, posted to a small number of

5   Websites, that they contend may be considered obscene in some

6   communities but not in others.   These examples provide us with an

7   insufficient basis upon which to make a finding as to the total

8   amount of speech that is protected in some communities but that

9   is prohibited by the CDA because it is obscene in other

10   communities.

11        16.   While the plaintiffs have offered evidence that,

12   for a small sample of communities, obscenity standards differ

13   from community to community, <u>see</u> Douglas Decl. ¶¶ 2(A), 5(A)-(B);

14   Nitke Decl. ¶¶ 12, 14; Danto Decl. ¶ 9; Wright Decl. ¶¶ 6-7, they

15   have not offered sufficient evidence to enable us to determine,

16   for the United States as a whole, the extent to which standards

17   vary from community to community or the degree to which these

18   standards vary with respect to the types of works in question.

19   Indeed, the plaintiffs' expert witness testified that he was

20   unable to determine the standards for obscenity in any given

21   region.   Douglas Decl. ¶ 5(D); <u>see also</u> Tr. at 264 (Douglas

22   testimony) (affirming that he "saw no pattern in terms of what

23   was prosecuted nationwide"); <u>id.</u> at 267 (Douglas testimony)

24   (agreeing that "community standards within American communities

25   are not reasonably determinable" and that Douglas has "never

1    conducted a poll or survey to determine community standards in

2    various communities"); Pls.' PTPF ¶ 50.

3         17.   There is insufficient evidence offered by the

4    plaintiffs to enable us to make a finding as to how much of the

5    material that might be found to be patently offensive and

6    appealing to the prurient interest in at least one community, and

7    that would not be found to be so offensive or appealing in

8    others, would also be found not to have serious artistic or

9    social value.

10        18.   There is insufficient evidence in the record to

11   enable us to make a finding as to whether "the variation in

12   community standards is substantial enough that the potential for

13   inconsistent determinations of obscenity is greater than that

14   faced by purveyors of traditional pornography, who can control

15   the dissemination of their materials." <u>Nitke I</u>, 253 F. Supp. 2d

16   at 607.

17   II.  Conclusions of Law

18        1.   Nitke's fear that the CDA will be enforced against

19   her is "actual and well-founded." <u>Vt. Right to Life</u>, 221 F.3d at

20   382.  She has submitted objective evidence to substantiate the

21   claim that she has been deterred from exercising her free-speech

22   rights, and this fear is based on a reasonable interpretation of

23   the CDA.  <u>See</u> <u>Am. Booksellers Ass'n</u>, 484 U.S. at 392; <u>Vt. Right</u>

24   <u>to Life</u>, 221 F.3d at 383.

1          2.   The injury in fact that Nitke suffered is fairly
2    traceable to enforcement of the CDA and would likely be redressed
3    by the relief sought.  <u>See</u> <u>Allen</u>, 468 U.S. at 750.

4          3.   Nitke therefore has standing to bring this pre-
5    enforcement challenge to the CDA.  <u>See</u> <u>id.</u> at 750-51.

6          4.   NCSF has submitted objective evidence that one of
7    its member organizations, TES, has been deterred from exercising
8    its free-speech rights and that this deterrence is based on a
9    well-founded fear that the CDA would be enforced against it.  <u>See</u>
10   <u>Bordell</u>, 922 F.2d at 1061; <u>Vt. Right to Life</u>, 221 F.3d at 383.

11         5.   The injury in fact that TES suffered is fairly
12   traceable to enforcement of the CDA and would likely be redressed
13   by the relief sought.  <u>See</u> <u>Allen</u>, 468 U.S. at 750.

14         6.   TES thus would have standing to challenge the
15   enforcement of the CDA in its own right.  <u>See</u> <u>id.</u> at 750-51.

16         7.   The interests that NCSF seeks to protect -- the
17   ability of those practicing non-mainstream sexual activities to
18   exercise their free-speech rights -- are relevant to its purposes
19   of fighting perceived discrimination against non-mainstream
20   sexual practices and providing a forum for discussion related to
21   that topic.

22         8.   Neither the overbreadth claim asserted nor the
23   injunctive relief requested requires the participation of TES as
24   a plaintiff, because the claim is addressed to the breadth of the
25   CDA with respect to all speech it reaches and the relief sought
26   applies equally to all affected persons and organizations.

1       9.   NCSF has therefore established that it has standing

2   to challenge the constitutionality of the CDA on behalf of its

3   members.  See Bano, 361 F.3d at 715.

4       10.  Because the plaintiffs presented insufficient

5   evidence to support findings regarding "the total amount of

6   speech that is implicated by the CDA," "the amount of protected

7   speech -- lacking in serious value, but potentially not patently

8   offensive or appealing to the prurient interest in all

9   communities -- that is inhibited by the [CDA]," or whether "the

10  variation in community standards is substantial enough that the

11  potential for inconsistent determinations of obscenity is greater

12  than that faced by purveyors of traditional pornography, who can

13  control the dissemination of their materials," Nitke I, 253 F.

14  Supp. 2d at 606-07, they have not established their claim that

15  the overbreadth of the CDA, if any, is substantial and that the

16  CDA therefore violates the First Amendment, id.

17      11.  Because we decide the case on the basis of the

18  failure of the plaintiffs to establish substantial overbreadth,

19  we need not and do not reach the issues of whether some of the

20  works that plaintiffs present as examples of chilled speech would

21  be protected by the social value prong of the Miller test,

22  whether current technology would enable plaintiffs to control the

23  locations to which their Internet publications are transmitted,

24  or whether the CDA's two affirmative defenses provide an adequate

25  shield from liability.

1    **CONCLUSION**

2        For the foregoing reasons, we conclude that the

3    plaintiffs have not met their burden of proof with respect to the

4    only claim remaining in this action, their overbreadth challenge

5    to the CDA.  The Clerk of Court shall enter judgment for the

6    defendants.


7        SO ORDERED.

8        Dated:    New York, NY

9                  July __25__, 2005



10
11                         ROBERT D. SACK
12                         United States Circuit Judge


13
14                         RICHARD M. BERMAN
15                         United States District Judge


16
17                         GERARD E. LYNCH
18                         United States District Judge


23